23-5159 Matthew D. Green, et al., Advance v. United States Department of Justice, et al., Mr. Margo, for the Advance, Mr. Springer, for the Evaluates. Mr. Margo, good morning. Good morning, Your Honor. May it please the Court. 17 U.S.C. Section 1201A grants the power to a component of Congress to decide who may access works of authorship. That is the power to decide who can access speech that might be in their lawful possession, and by extension, to decide who gets to make high-quality copies for fair use in their own speech. This speech licensing regime thus regulates not the location of news racks or the timing of an event in a Chicago park, but the content of speech. It fails minimum procedural requirements applicable to speech licensing regimes for three reasons. First, it lacks clear standards. The Romanet 5 catch-all exception is enough alone to fail the constitutional test by allowing the librarian to consider other factors as considered appropriate without limit. Second, there's no requirement of prompt decision-making. That can be a flexible requirement, as was seen in this circuit's case in Bordley in 2010, but nonetheless, the lack of any promptness requirement fails the test. And finally, there's no provision for judicial review of the librarian's final decision. If the scheme were organized so that the copyright office and not the librarian were the final decision-maker, there would be administrative procedure act review. As it happens, the librarian is protected by its sovereign immunity. Mr. Mango, if the statute, instead of having the criteria that it has for the Library of Congress to issue periodic exemptions, it just said the Library of Congress will issue periodic exemptions to make advance determinations on categories of speech that are clearly fair use, would you have the same objection that you're raising here? Yes, Your Honor. That sounds like fewer standards or less clear standards rather than more clear standards. It might be worse constitutionally. Just a point about the fair use right considered so important in Eldred and Golan. It's an individualized right. It amounts to an affirmative defense. It's notoriously fact-specific. It's adjudicated by judges, and the common law is developed that way. And dispensing a fair use engross in advance to broad categories of speakers is content discrimination, not a salutary. That's a puzzling answer to me because it doesn't dispense presumably with a fair use. If the fair use defense is a First Amendment right, then why isn't that available, whatever the statute says? Your Honor, if this court were to follow the federal circuit, the Chamberlain garage door opener case, that's not how the government interprets the statute. That's not how the librarian interprets the statute. But if there were an affirmative defense to say my 1201A circumvention is not linked to infringement, either because I only want to read the work or because I want to make fair use of the work, that would satisfy the Constitution with respect to the overbreath claim. That would leave untouched the problem of speech licensing and standardless decision-making process. Why would it? If the standard were the fair use standard, why is that standardless decision-making? On the one hand, anybody who brings their claim to the court would get a court adjudication regarding fair use. But in order to give people extra comfort, the Librarian of Congress is going to do categorical ex-ante fair use exemptions, and everybody else who might be more particular or might not have been addressed or might not have the money to bring a petition to the Library of Congress would still have their fair use defense. I'm not sure why it's a problem to have the ex-ante effort to alleviate that burden. If the librarian had a broader standard to apply? If the standard were the fair use doctrine. That might be a clear enough standard if the Roman F-5 catch-all consideration that allows exogenous policy considerations to creep in. If it was only the fair use standard, that might be sufficient. There would also be a requirement of prompt decision-making and the requirement of prompt judicial review to make sure those standards were reasonably applied. You talk about it being speech licensing. What it's licensing is circumvention. Circumvention gets to the end of engaging in speech. But what's being licensed is circumvention. Is your position that all circumvention barred by the statute is speech? Your Honor, circumvention is defined here as bypassing or accessing a work that's protected by a technical measure. Nothing more is required than to somehow bypass. It is the bypassing or decrypting. It is the act of getting to something that is a circumvention. It's not just something that you get to. It's the act of getting there. It's not the destination that's regulated here. You can think of this as barring driving around on roads that are blocked off for construction instead of staying on the main way. You can't do that regardless of your destination. This is about the process of getting to something that's speech. But what I'm asking you is circumvention, the process of getting to something that they may want to read or look at. Is the process itself categorically speech? The process of circumventing is only applicable to accessing a copyrighted work. It's simply so close to... I understand that. But you just said the circumvention is to access something. Now, that work no doubt is the speech of the copyright holder. No doubt. And so what I'm really struggling to understand here, whether you're saying the mechanical or technical acts of engaging in circumvention to get that, to get to the goal, is itself, is the circumvention itself speech? So, Your Honor, if I have the DCSS encryption key... And then I promise I will let you speak, but I'm just... We're not arguing that the decryption key is speech. We're not arguing that the act of unlocking it is expressive, but it is part of the speech process. Is the act of bypassing protective measures, technological protective measures, speech? The act of reading is speech. I didn't ask you that. The act of bypassing, of getting to it. You can read it when you get there. Is the act of getting to it speech? It's either part of the speech process or it's conduct so closely... So your argument is that all acts of circumvention are themselves speech. My argument is that circumvention is so closely related to reading that it's... That's different. What's licensed here is circumvention. And you said this is a speech licensing regime. But what you... Sounds like you mean is what they're licensing here is technological means of being able to engage in speech. That's your objection. That's different than a speech licensing regime. Your Honor, I think it's so closely related that it's more closely related than reserving a soccer field in a park. It's more closely related than figuring out where your news racks are going to be. It's... Tell me why it's more closely related. Because if something is protected by a technological protection measure, there is no way to read the work without, by definition, circumventing, even if you merely bypass or avoid the technological measure. It's more related or not. There's no way of putting newspapers out on newspaper racks without actually putting racks out there first. Right? But the placement of the rack, it's... If you just wanted... If I just wanted to engage in putting old, unused newspaper racks, littering them across the city, no intention of putting newspapers on them, that would not be speech. Assuming I'm not doing this in some sort of performative art. That would not be speech. I just want to... I got a thousand of these in my garage. I want to get rid of them. I'm just going to put them all around the city. That, of course, would not be speech. That, of course, would not be speech. Can we agree on that? It is not speech to place objects on the ground for no speech purpose. Even if they are actually designed to hold newspapers. Well, if it's... That's what they're designed for. If somebody else designed them and I'm merely dumping them in a garbage dump, that's not speech. Really. Right. So, the reason that the protections were for newspaper racks was because they were going to be displaying speech. Precisely. So, the licensing... A rule against putting things out there is not itself a speech licensing regime. You have to show that the function, and in that case, the sole function, design and purpose for putting them there was to put newspapers on. Well, Your Honor, I think the analogy would be a law forbidding placing news racks. And, of course, they're going to be... I mean, you could imagine a case where somebody is dumping a news rack. Although, here, I don't think you can. I don't think it's possible to read a work protected by a technological protection measure without authorization unless you bypass or avoid the measure. No, because there's all kinds of people who want to bypass and avoid things so they can steal them and make money. They may never even read them. They just want to sell them. That's not speech. Is it? Stealing it to sell it to make money, is that speech? The act of reading the work is speech. I'm imagining someone here engaged in piracy measures, and so they want to decrypt or circumvent whichever verb you want to pick out of the list. They want to do it so they can get access to this material. It's a very highly anticipated book. It hasn't been released yet, and they want to sell it because they can make a lot of money. They have no intention of actually even reading it. They just want access to this document so they can preempt the copyright holder, sell it, and make a lot of money in a bootleg market. Is there anything involved in that that is speech? Yes, Your Honor. Piracy is speech, but forbidding it doesn't violate the First Amendment, as we learned from the reading going on. Piracy, the stealing is speech. So, if I steal books out of a bookstore, I'm engaged in speech? If you physically steal a book with the intention of reading it? No, I didn't say that. I said I physically steal books out of a bookstore. Is that speech? If you're physically just moving paper and you're not reading it at all? Am I hypothetically stealing this copy of a book, electronic book of some sort? I'm physically stealing it. I said I didn't want to read it. I just want to sell it. I'm going to make a hot dollar off of selling this on the Internet. You said all piracy is speech, and I'm questioning that. I don't understand why piracy is different than theft. Piracy in the sense of distributing speech is speech. It's just permissible to prohibit it under the First Amendment. So, if I go in and steal books out of a bookstore, and then keep them in my house, is that speech? If a book is stolen and no one's ever going to read it, perhaps that is not speech. But if I steal it and then sell it, that is speech. If I steal it to sell it, stealing is conduct necessary. What is your best case that stealing books and selling them is itself speech? Well, I go to the logic of Golan and Eldred, where copyright grew up at the same time and has the same tradition as the First Amendment.  I don't have a case where anyone cared whether distributing pirated goods was speech, because it is permissible under the First Amendment to prohibit it. So, your argument, I think, would sort of route into a further line of questioning when Judge Millett was asking you, what is the speech that's at issue? Am I right that it is speech, fair use, that depends on circumvention? That's the speech you're talking about? The speech is both the act of reading the media and the act of taking fair use copies of parts of it to create your own speech. So, it's not that the decryption key, DCSS, is speech, it's that my DVD in my house contains speech, I want to read it, and I want to take various clips of it for use in my own speech. So, it's reading and or fair use that depends on circumvention? Yes. Sorry, can you make sure I understand that answer? When your decryption technology reads their encryption technology to unlock your access to the e-book, is that decryption technology reading the encryption technology self-speech? No, it's conduct that's necessary for the speech process as part of the speech process. And you want to use that end product for fair use purposes? The necessary and immediately following obvious results of the step, yes, the next step is speech. You put a whole lot of necessary and obvious that are neither necessary nor obvious to decryption in my view. Well, Your Honor, decryption is not necessary for circumvention. Again, the acts of circumvention, whatever way you're doing it, whether you're decrypting or unscrambling or bypassing, going around, any of those that are listed in the statute, you're not arguing that that's not the reading that you're talking about or the information gathering that you're talking about. It is only the copyrighted product at the end and the uses of that that you are claiming as speech. Correct. I'm not saying that the act of opening the book is itself expressive. It's just necessary to read the book and necessary for me to make fair use of parts of the book. And so can you give us examples of. The kinds of fair use as to which circumvention circumvention is essential. Yes, Your Honor, the filmmaker and make you talk about this and we're on a motion to dismiss, of course, we have this in the complaint discussed in anyway in the complaint. So filmmakers take various clips of other films and take images that are used documentarians, but also narrative filmmakers. Security researchers like Professor Green take the speech that's in objects or systems and then create scholarship citing that. And then there. Yes. Explain that again. The second one. Well, yes. So if Professor Green researchers. Yes. If Professor Green or other security researchers have a piece of media or an object that's filled with code and code being speech there, they read that, understand it, and then create research to inform the public or to inform those who could correct the security problem. There are also blind and print disabled people who merely want to read the speech there. They may not be making fair use, but they're they're reading speech. But that is it is it a violation of the First Amendment to offer a product with limitations like to offer a print book. That isn't automatically read aloud to you or of film that you're paying a low price for because you only get to watch it for a limited period of time. You don't get to copy and manipulate it. It seems like you're when you talk about ownership, you're reading a lot of things into ownership that were never offered or purchased. Yes, your honor. I agree that some of the examples that the government mentions without citation to any record, because we're just on the motion to dismiss record without discovery on page twenty one of the at the least brief. These sound like the sorts of things that would be ordinary consumer uses of media. We don't know the details of those haven't been explored below. But we're not contending that creating a contract around reading a piece of speech violates the First Amendment contracting party. You're reading disabled. I can't remember the phrase you use, but if somebody can't read their ebook without decrypting it so that they can make it more accessible. Why isn't that subsumed by by the acknowledgement you just made to offer to them in that way? That case might be adjudicated that way. I don't know. But that's one of your examples. So your examples are filmmakers. If filmmakers are doing fair use, then they're not liable. Your honor, we're just saying so for purposes of speech licensing claim, we're claiming that speech and that the librarian gets to pick winners and losers. Are you in your position that the librarians picking of winners or losers displaces a fair use defense that would otherwise be available? No, your honor. And so how does it disadvantage a filmmaker who is able to decrypt wants to fair use clips of someone else's film? I would point the court to Bordley from 2010. There, the person who was required to get a speech license wasn't denied a license. He was allowed to leaflet in the park. But nonetheless, the court overturned the regime that would have allowed arbitrary decision making. Except there, there's a ban on leafletting if you don't have a license. Whereas here, there's no ban on fair use. If you don't have a categorical exemption, the categorical exemption is saying you don't even have to get into a situation in which someone goes after you and sues you for copyright infringement because we're going to tell you in front that this swath is fair use. But you still, as a filmmaker, you know, Disney can still do fair use and make some parody of someone else's film. And if they get sued, they say fair use. Your honor, there is a categorical prohibition here. It's in 1201A. You're categorically prohibited from accessing a copyrighted work without the authorization of the copyright owner if there's a technological protection measure on it. Some people get out of that prohibition because they are in favor of the librarian. Some do not. And that is separate from copyright infringement. Those who try to make fair use when they're not able to circumvent, they have to tend to use lower quality media. And is quality of media First Amendment protected? Yes, absolutely. A two-life crew in the Campbell case was entitled under the First Amendment to use a high quality sound recording of Roy Orbison's great guitar lick from Pretty Woman. That case wasn't about what level. That was about whether parody was protected at all. It didn't say that you have a First Amendment right to the highest tech version of any medium, any song or book or anything out there. You have a First Amendment right to that. Well, your honor, that case did say that you need to be able to take as much of the work as you need to make parody of it. That's very different from what quality form you're going to get it in. I don't understand why you say that there's a First Amendment right to get everything in the highest quality form in which it is available. I only say that there's a First Amendment right not to be prohibited by the government from using the high quality version in your lawful possession. Again, that just begs the question of what's in your lawful possession when you purchase an e-book. If you purchase it subject to conditions and requirements, then you only own what you purchase. We'll run a motion to dismiss, and there's no e-book conditions or terms of service in the record here. That might be one of the examples. I think we can just take it as given that nobody is selling the right to – if you could identify in your complaint an allegation for some copyright owner when they gave you access to an e-book, or you had access to watch a movie on your Netflix, meant you had access to do it any way you wanted regardless of the conditions, put on your acquisition of it, let me know. I don't see that in your complaint. And if you don't – if it's not what you're buying, it's not what you're buying. It's like you're leasing a car here and you want to say, fine, now I can do anything I want with that car, and there's nothing you can do about it. And that's not how it is. It's still their property. You're just leasing it. Your Honor, I own DVDs. Only DVD is subject to the protections that are on them. It's subject to piracy laws. Yes, Your Honor, which has a fair use provision in it, which is why piracy is – Do you think all fair use is protected by the First Amendment? I think so, because that's how fair use is defined. Would you have to decide that to rule in your favor, that all fair use is constitutionally protected? No, Your Honor, because the way the government interprets this statute, there's no fair use defense at all. So you don't need to determine it. You're talking about speech licensing and integrally related to speech, but if in fact a lot of the fair uses you allege in your complaint are not themselves constitutionally protected speech, unless we hold that every fair use – that one, they qualify as fair use, and two, that all fair use is constitutionally protected, we can't get to your theory of the case, can we? That's a big question. The Supreme Court has said time and again in the VHS case, well, yeah, we think you can do this, but Congress can certainly revisit it. They don't normally say that when something is protected by the First Amendment. Well, Your Honor, I think we plausibly allege examples of filmmakers and others who are making fair use, and it would also be possible for this court to merely say that the district court at JA 286 and 87 was wrong in sidestepping the entire overbreadth question by invoking Citizens for Vincent. Respectively, this isn't a Citizens for Vincent case. The as-applied claims that are no longer in the case are different from the overbreadth claim that remains. But can we even find that there's an overbreadth claim without understanding – overbreadth claims aren't allowed for fair use. There's not a fair use overbreadth claim. There might be a First Amendment overbreadth claim. So to have an overbreadth claim, you're going to have to show that all the speech is not just fair use, but in fact is protected by the First Amendment, right? Yes, on a record, once we have discovery, we would have to show the verdict. No, but first you have to allege it in your complaint. Yes, Your Honor, and in the record – So how do I know that the examples that you have given, and post-green, so we know that Mr. Wong's technology doesn't count as protected for these purposes. So where have you alleged that – or how do I know from the examples you've given of people who want to take longer clips than the licenses allow? Who want to take – you know, to convert things from one format to another, from e-book to audio book. How do I know that that is First Amendment protected speech? Well, Your Honor, in the record, the Copyright Office's 2017 report does acknowledge that there were fair uses and free speech rights burdened. There were some, but overbreadth doesn't get to say that there were some that were burdened. It doesn't get to say that 49% were burdened, probably not even 51%. It has to be a lopsided ratio. So where do I get that from your complaint? Well, Your Honor, I would just say that overbreadth claims like Stevens was on a full criminal trial. These overbreadth claims tend to be on a thick record with summary judgment or trial. Our complaint alleges various uses that we assert are fair, whether – if you've taught up the exact percentage of people – Can you identify an example from your complaint that we can tell, applying our Green One precedent, is a First Amendment violation? Do you have one example of an actual First Amendment violation alleged in your complaint post-Green? Is Your Honor suggesting that it would be so much detail that this court could – I'm asking – I'm not aware of any overbreadth complaint because Mr. Green's out, and Mr. Wong, we held in Green One, is not constitutionally protected. His technology is not constitutionally protected. So I know you've got other allegations about them and about other people, but to state an overbreadth claim, it seems to me that the one thing you should be able to do is identify one person whose speech that you seek to protect we know is constitutionally protected. A very easy thing to do in the Stevens case. I just don't see it here. Well, Your Honor, Professor Green, I submit, has standing. The last panel said he lacked standing on the as-applied claims to get a preliminary injunction. Professor Green today is participating in the 2024 – His book selling is not – his book is not even the type of medium that's regulated here as circumvention. But for circumvention, he would rely on the 2024 rulemaking giving him another exemption. He's participating in that now, under the standards of standing. He may have gotten an exemption from the Librarian of Congress, believe for him, but where does that show me that you have precise conduct that actually violates the First Amendment? Do you agree that to state an overbreadth claim, the complaint must at a minimum identify one person whose conduct is plainly protected by the First Amendment, that we can tell that from the face of the complaint? I believe that you have to plausibly allege, yes. But I think that fair use is so notoriously fact-specific that it would be too high a standard to say that you have to allege. So in this area, you want a special rule in this area that to state an overbreadth claim, you don't have to identify anyone whose conduct is on the face of the complaint protected by the First Amendment, just that you can allege facts that someone later down the line, after discovery, might or might not conclude plausible as a First Amendment claim. That's the pleading standard. Not at all, Your Honor. I just want Twombly-Nichbol to apply to motions to dismiss an overbreadth claim. But you want way more than normal Twombly-Nichbol. Overbreadth is a special category. I'm just not aware of a case in which it was considered by this court or the Supreme Court, or you can tell me any other appeals court, where nobody could identify a names plaintiff or anyone else listed, where we know there's a First Amendment problem. Might or might not be, but we don't know. You can allege overbreadth because that requires a volume, and if we can't tell from the face of the complaint, we're not sure there's even one. Maybe, maybe not. How do I know that you've alleged an overbreadth claim, as opposed to maybe some as-applied claims? Your Honor, narrative filmmakers were denied an exemption. K-12 instructors were denied an exemption, whereas college professors were allowed the exemption. Okay, so let's start again. So these K-12 instructors, I guess they want to use that copyright material at the end. Do these K-12 instructors claim to have the technological capability themselves to circumvent? Yes. They have the circumvention capabilities? It's widely available, as in Corley, it was on the internet openly, yes. So they are ready to use this, they have the systems and they are ready to use this technology to circumvent. I understood from your description of them that they simply want to use this material, and all you allege is that they want to use this material in certain ways, not that they actually themselves wish to circumvent and get the material, as opposed to someone else getting the material and then they'd like to use it. No, if I'm a fifth grade teacher and I have a DVD in my house and I need to get a clip off the DVD, I want to show a 30-second clip of the DVD to my kids in the full definition, and to do that I would need to get the CSS off the internet or some other commonly available tool. Okay, and we know that that K-12, that use, contrary to the copyright holder's intentions and desires, is First Amendment protected because of what? We know because it's fair use, because it would be a short clip. That fact that it's all fair use is necessarily First Amendment protected, which the Supreme Court has never said. Your Honor, fair use is notoriously fact-specific, so I could invent a hypothetical where one fifth grade teacher uses too long of a clip and it's not transformative use, that might not be fair use, whereas another fifth grade teacher uses a short clip and it's for a specific purpose that in context makes it clearly fair use. They might use it as a parody. But the fact aside, does that make it First Amendment speech? When it's being done, when they want to copy something against the will of the copyright holder and yet it is still First Amendment protected? Now, fair use is First Amendment protected. Yes, Your Honor, I believe that under Eldred and Golan, fair use is considered to be an essential accommodation to the First Amendment baked into copyright law. But it didn't exist initially with copyright law at all. Fair use, well, I believe it existed since Justice Story and Folsom v. Marsh. Did the first copyright statute have a fair use provision? The Copyright Act codified a pre-existing common law right that I believe goes back to England. Are you sure the common law right had a fair use provision? Yes, Your Honor. What's your best case for that? Folsom v. Marsh, Justice Story. I have a remedial question, which is if we were to agree with you that the Librarian of Congress Triennial Review is an unconstitutional licensing scheme and invalidated that, then the rest of the statute could stand. I believe it would only affect the 1201A circumvention regime because the trafficking portion, there's nothing in trafficking would be affected at all. But it also would be severable from the anti-circumvention provision. Yes, Your Honor. And then would the remaining law be unconstitutional, the law that prohibited circumvention and trafficking? That would be unconstitutional only if we prevail on our over-breadth claim. And why isn't your over-breadth claim determined by the first appeal in this case? Because it wasn't considered there. The first panel said it did not have jurisdiction over that claim. So while I take it that on the preliminary injunction record, we have a holding that the net VCR is not, can be constitutionally prohibited, that's essentially all we have there. The court said that the DMCA's incidental restriction on alleged first amendment freedom is no greater than it's essential to the furtherance of the government's interest. Doesn't suffice to foreclose us from finding over-breadth? Not at all, Your Honor. The last panel from the, I believe, one of the first sentences of the opinion and throughout. I know formally they say we're not ruling on over-breadth claim, we're only doing as applied, but I'm just looking at the rationale in that case. Yes, they were focused on the decryption key. The way they phrase it, it's that people who write code have a first amendment right to write decryption code. So here we're not talking about the decryption code, we're talking about the content of the DVD on my shelf, and we're talking about the fair use clips I'd like to show to my fifth grade class. So, again, you're looking at the use, fair or otherwise, expressive uses of materials that are now behind an encryption wall. Yes, but both the reading and the use. So I read before I am incorporated into my own expression and both are protected. Why do you think if we invalidated the librarian as gatekeeper that you wouldn't be deprived of the escape hatch and you wouldn't be able to get past the protective measure? Your Honor, typically when a statute is struck down for violating the First Amendment, the remedy tries to level up to allow more people to speak rather than leveling down. But also, even if the librarian as gatekeeper were struck down and the exception process were eliminated, it would eliminate this distinct First Amendment evil, which is having an unaccountable and standardless decision maker pick winners and losers. But wouldn't you then be without any way to get around the anti-circumvention provision? Yes, if that was the remedy, yes, our particular plaintiffs would be without the triennial exceptions until such time as Congress corrected the statute or amended the statute. And how would Congress do it? I'm sorry, so it wouldn't be sellable? Well, Your Honor, I'm just going with your hypothesis. I'm not sure if I understand it. I believe that the whole circumvention portion of 121A… Let me try to make it clear. Right now you have an avenue to get around the anti-circumvention provision. You're challenging that. And if we agree with you that that exemption with the librarian as gatekeeper, without the judicial review, without the prompt review, and so forth, is struck down, you're left with no way to get past the protective measure. Your Honor, in Bordley, Mr. Bordley got a license, but then he attacked the licensing regime, which this court struck down. I believe that the remedy there was that anyone could lease it without a permit. They enabled more speech rather than restricting speech. But we wouldn't necessarily have to so hold. I mean, you answered my question about severability. Take away the triennial licensing scheme and just leave in place the ban on circumvention and trafficking. Arguably, that gives the readers and speakers that you're concerned with fewer, less guidance, less security against enforcement. But it does take away the Library of Congress's role, which I gather to be the core of your anti-prior restraint argument. So you sort of have, like, restraining less speech, but introducing this ex-ante control that you mistrust, or functionally restraining more speech, but with only the courts being the adjudicators. And you're favoring what I put second, what I just described second. Well, yes, for purposes of the speech licensing claim, I do believe that the triennial rulemaking would need to be invalidated. I look at the Town of Gilbert case. There were sign regulations that admirably allowed political and ideological signs to be very big, bigger than other signs. Nonetheless, that's content discrimination, and the ordinance was struck down. What other than the fifth other factors provisions really problematic, unguided? Reading it, it seems very much trying to codify something akin to fair use, maybe even broader. I believe that the statute could be corrected only by eliminating the Romanette v. Catchall. Yes, or by saying that essentially it – I mean, if all it means is that the librarian may consider whether classes of works are being – the prohibition is going to have a negative impact on speakers in the next three years, and Romanette v just means if something's directly relevant to that, then consider it. If it were narrowly construed like that to exclude bringing in auto emissions policy and the like, then that would be permissible. So that would be a full relief from your perspective. If it was just read in a kind of eustem generis way, you know, that this v is to be read in the context of Romanette I through IV and in the service of those, then reading it that way would cure the problem that you have. That would cure step one of the three steps in the speech licensing concern. Obviously, it wouldn't address promptness. That wouldn't address prompt judicial review. I'm going to have to ask the government about it, but your concerns with promptness and prompt judicial review depend on understanding the act to displace any other fair use defense. Because you wouldn't need prompt judicial review of the Library of Congress ruling if you retain in your pocket a fair use defense. You're just as good off, just as well off as you were before the Library of Congress tried to, you know, ease broad categories in terms of promptness and prompt judicial review. The government doesn't interpret the statute to include a fair use defense at all. Does it interpret it to displace a fair use defense that you'd otherwise have? Well, if the government sues me for copyright infringement and 1201A circumvention, I have a fair use defense in their view for the former, but not for the latter. So however fair my use was, they can still get me if I use DCSS to decrypt my DVDs. You have a First Amendment defense regardless. I can't take the First Amendment out of the MCA. To challenge the application. You only have a First Amendment defense. So to the extent that you're correct that fair use is supported by or is as strong as the First Amendment, then your concerns would seem to rise or fall with the extent to which you write about that. That wasn't very clear. So you've taken the position that fair use is and should be viewed as a First Amendment right? Yes, Your Honor. What Judge Mileva is saying is that you would have a First Amendment defense. You could try to make out a First Amendment defense. If you are correct that you are engaging in fair use and that fair use is a First Amendment right, then it doesn't matter whether the Digital Millennium Copyright Act codifies that because it's a constitutional entitlement that would remain. Your Honor, that sounds like saying that we would have to bring an as-applied challenge rather than a facial challenge. Well, no. If somebody tried to prosecute, just as was always the case with any law to which you might have a First Amendment defense, you could say, no, no, First Amendment here. Right? I could bring that defense. I'm worried about chilling, of course, because part of the concern about speech licensing regimes is that they cause people to self-censor. It seems like a very odd complaint to bring. Maybe the way to clarify my question is, if we read the Digital Millennium Copyright Act triennial rulemaking as an effort to do some kind of advanced wholesale description of fair use categories to just ease people's concern about chilling, and then if you're right that the First Amendment protects fair uses that might not be captured in those categories, to be worried about the Librarian of Congress rulemaking as something that's going to add a chill to someone's experience without those exemptions seems perverse. It seems very unlikely. It sounds like a well-intentioned provision that nonetheless places a government official in charge of picking winners and losers among speakers. Other than the tinkering with your car software to deal with exhaust, which I'm not sure where the reading or expression comes in, but what examples or hypotheticals do you have of the Librarian of Congress exercising the discretion that is given by the statute in a way that is chilling? Well, I mentioned the difference between K-12 or adult GED teachers and university professors, the difference between narrative filmmakers and documentary filmmakers. If I'm a narrative filmmaker and I'm not given an ex ante categorical exemption, I'm not included within one of the rulemaking, but I still have a First Amendment right by your hypothesis to fair use, how am I disadvantaged? Because your insurance company and your production company and the people who finance you will not agree ex ante that you are clearly allowed to do it, and so your speech will be chilled. If we struck down those categories, the Roman at one through five, if we struck down the Librarian of Congress rulemaking, that would still be the case. That client, the narrative filmmaker, would be in the exact same jeopardy. Maybe I'm wrong about my fair use scope determination, maybe I'm wrong that this is a First Amendment right, but that would be true with or without the Librarian of Congress provision. Yes, Your Honor, the problem with the broad prohibition is limiting all speech, limiting things that people have the right to do. The problem with the librarian being in charge is that people will try to anticipate the librarian's preferences, try to shade their speech toward what the librarian wants to hear, and that they're subject to content discrimination by the government. We don't have any examples of content discrimination. I mean, are you saying that the university versus K-12 is content discrimination? I am, Your Honor. I wouldn't have a fifth grade course delivered to college students, nor would I display a documentary and describe it as a narrative film. But that doesn't add chill, if you are right, about the expressive fair use First Amendment protection. I agree that the librarian making the decision doesn't add general chill. It subjects me to content discrimination by the government, which will, among other things, lead me to try to speak in ways the government might approve of. I just want to make clear, your K-12 teacher, it's not enough to have an overbreath. If we thought you had alleged an overbreath challenge to the circumvention provision, how have you alleged an overbreath challenge to the trafficking provision? Because if the K-12 teacher cannot get that software you mentioned that they need, and I read our green decision to say, there isn't a First Amendment right there, your case falls apart. You have to win. You have to take down trafficking to get anywhere on circumvention. And how does your complaint allege overbreath as the trafficking provision, given our decision, in light of our decision in green? Your Honor, the trafficking and circumvention provisions rise and fall separately. It may be that we have not plausibly alleged that there are more cases of trafficking being unconstitutionally forbidden than constitutional. So if that falls out, if the trafficking challenge falls out, although I'd like you to tell me if you think you've actually stated a claim there, but let's assume for my question that it falls out, well then, how many of the people that you list in your complaint, the K-12 teachers, can independently have the technology to decrypt, circumvent, otherwise access this information, if they cannot get anything from, they can't buy anything, they can't get it, they cannot engage themselves in the decryption process? Your Honor, we allege in the complaint that, for example, the code that protects that trapezoid cable, the HDMI cable, is publicly available. The Corley case is all about how publicly available, easily available, the DVD decryption devices, Blu-ray has similarly been cracked publicly. So I would, as a factual matter, I think the K-5 teacher can simply decrypt it. Does it violate anything if they, are these things available for free or do they have to pay for them on the internet? I don't know the answer to that, Your Honor. Do they have to pay for them? Are they not involved in trafficking if they buy this stuff off the internet? I could be wrong, I don't know exactly what that's defined, but it seems like a silly answer. In the Corley case. We just don't let you sell it. Well, in the Corley case itself, it was given away for free, if that makes a difference. There's no allegation in the complaint about this. That's what I'm trying to figure out, that I understand, like, why you say the K-12 teacher, what they want to do, and why you think that would fit within traditional fair use. And maybe you even have an argument or not, but maybe let's assume that that actually would be First Amendment protective speech if they did it. Without being able to use technology that is criminalized by the anti-trafficking provision. I don't see how your chill problems are gone, and I don't see how you can make a plausible allegation that there's all this speech to be engaged in if they just can't break in to do it. Your Honor, the entire premise of the 1201 rulemaking, the whole reason why all these people get together every three years, is because they know it's easy to do. Everybody is circumventing the question, and they have the tools. The triennial rulemaking does not prevent trafficking. Everyone's already doing it, and they already have the tools, then why are we here? Because they don't want to risk government prosecution. They can't do it. Exactly. That's my question. If you don't take down the circumvention ban, they're going to have the same risk. I'm not sure I understand the question, Your Honor. I'm assuming, government can certainly tell me if I'm wrong, that at least purchasing something off the internet that is illegally trafficked may itself be unlawful. Assuming at least there's some sort of intent there. And if purchasing is, I'm not sure why downloading something that I know is unlawful and stolen isn't also covered by the trafficking ban. So, if all the speech you want to allege, and we're here on the circumvention claim, just can't be accomplished as long as there's a trafficking ban, then there's really nothing to be protected there. Your Honor, I disagree. Well, one reason is that we allege... I'm very much misunderstanding this. Well, we allege in the complaint that these decryption tools can simply be figured out. You know, somebody can reverse engineer within their rights. No doubt there are people in this world who can. I promise you, I could not. There's brilliant K-12 teachers. I had some great ones, but I can't assume, and I'm not going to assume, that all of them can do the math on their own to do this. Or at least that there is such a volume of people out there who can do it, that we've got an overbreadth problem. I'm expecting that actually those people are pretty rare. Am I wrong? Can you do it? The people who can actually develop a decryption tool? Sure, it does sound like they're rare. But people are getting them all the time. Okay, so I'm thinking most people that you've identified in your complaint can't do it. Either for mathematical ability, resources, time, can't do it. So saying that it can be done out there really isn't much by these incredibly sort of genius-minded people. It doesn't really help here. So now all your people, most of your people in your complaint, obviously Mr. Hamon can, but the other ones, if they can't do it, if they can't get the technology, there's nothing for us to help them with. Well, they do get the technology. That's the premise of the 1201A rulemaking. The filmmakers do it, as they mention in their amicus brief and as alleged in the complaint. There would be no reason to apply for exemption. They do get it through exemption? Or are you talking, there's no exemption to trafficking. So I'm sorry, they're getting it off the internet. Well, trafficking has certain requirements. It's not that every single decryption key is a de facto trafficking violation. It would be possible to have a key without having trafficked it. If it was given to people. It's pretty hard. I mean, let's say someone bona fide comes into possession of it, but it's not normally how theft works when people come into possession of stolen property. And if they know there's a trafficking ban out there, if we're assuming for those purposes your trafficking ban fails, or at least if you haven't stated an overbid claim. And they know, because you told us they're all going to be killed by it, so they must know. Then what are we protecting? So people go to get an exemption from the circumvention ban, and they invest a considerable amount of hours and lawyer time over the course of more than a year to complete the process. There's a hearing. The reason they go through all that bother is because they know that if they get an exemption, they will be able to use it with off-the-shelf technology. There's technology that does not violate the trafficking ban? I don't know whether all of the technology violates or doesn't violate the trafficking ban. Obviously, technology itself is not. All of the technology, by your hypothesis for the circumvention ban, has to circumvent these protections, unless you come up with it yourself. Well, there's no banned technology in the statute. It is banned acts by people. So I don't know, as on the motion to dismiss, I don't know how many of these tools were trafficked or not. The trafficking ban is putting things out there, for example, with the primary purpose of circumvention. That's illegal. Certainly, this statute doesn't make DCSS, the decryption key for DVDs, it doesn't make it illegal. It's not illegal to possess it, but it's illegal to circumvent it without an exception. Use it. To use it, it is illegal to use it without an exception. That's my point. Okay. If you get an exemption from the Library of Congress, you can use the key, no matter how you got it. Yes, Your Honor. Yes, and I don't think the librarian is aiding and abetting massive lawbreaking by doing so. Do you have an argument that you've stated an overbred claim as to the trafficking provision? Yes, Your Honor. The previous panel disclaimed jurisdiction over that claim. So I agree that there are fewer examples in our complaint of traffickers than there are of circumventors. Have you stated an overbred claim? Yes, Your Honor. How? Because the statute... Sorry, which specific concrete examples in your complaint show me... Give me your best example of someone that you've identified in your complaint and the facts you provide in your complaint that show me that the trafficking provision, the trafficking provision only as applied to that person, is unconstitutional. Your Honor, if I may do that on rebuttal, if that works for you? Sure. Thank you, Your Honor. Mr. Springer. Good morning, Your Honors, and may it please the Court. Brian Springer on behalf of the federal government. I'd like to just take a step back and contextualize what we're discussing here. The Digital Millennium Copyright Act provides incentives for copyright owners to make their works readily available in digital form. The compromise that Congress struck in the act was to allow restrictions on access to prevent the massive piracy that would result if consumers could easily create unencrypted digital copies and rapidly disseminate them across the globe at the click of a button. Without the protections that are challenged in this case, manufacturers could mass-produce devices that would wipe away access controls on every type of digital content imaginable, and anyone could go to their local Best Buy or Walmart, buy such a device, and use it to create unencrypted copies of all variety of movies, TV shows, music, and e-books. I think one important thing to do here is to focus on what the Digital Millennium Copyright Act actually prohibits. It's not a restriction on speech at all. It is a restriction on conduct on a particular act, namely the act of circumvention, and then the trafficking in devices to enable that circumvention. So this is different than I think what many of the examples that are being talked about here about restrictions on actual speech. This is not a restriction on speech. It's a restriction on conduct. The appellants, you know, they really lean on City of Lakewood and the idea that there was also not a restriction on speech. It was a restriction on conduct, but the conduct had such a relationship to speech that the court treated it as a speech restriction. And they're doing the same thing here. It would actually be really helpful if you could address why that's wrong and whether there's any precedent that helps us see that. Sure. And I think that Lakewood is a different circumstance because there we're talking about, you know, putting out racks so that you can distribute newspapers. So that has in and of itself sort of an inherent, you know, connection to speech itself because without having the rack, you couldn't have the newspaper that you're putting out into the world. This is multiple steps away, and I don't think that the other side is disputing that there are many, many examples in which this statute can be, you know, applied to a situation that doesn't involve speech at all, whereas that was a situation where sort of every single instance, you know, would be an instance in which you're talking about speech, namely the distribution of newspapers. And here, again, you know, particularly in light of this court's previous decision, there are many, many applications of this act that have nothing to do with speech and that don't implicate First Amendment concerns. We're talking about, again, a restriction on conduct that may have incidental effects on speech, and I think those are the cases that we should be looking to think about this analysis, Your Honor. How can it not be a restriction on speech when it results in total non-access to that speech? Sure. I don't actually think that it does turn into a situation where people aren't able. So, for example, if somebody buys an e-book, they buy the e-book for the ability to actually read the text of the e-book, and nothing in the Digital Millennium Copyright Act is preventing them from doing that. They're able to do that. What plaintiffs want is to go beyond what, you know, these third parties have bargained for and examine the source code or, you know, use it in a different format. They want to engage in fair use. But, Your Honor, I think the right way to think about this is that fair use, you know, has never been – the Supreme Court has never said that fair use by itself, you know, is sort of a free-floating First Amendment protection. The Supreme Court, whenever it has talked about fair use, it has done so in the context of a specific restriction or regulation of expression, and the Supreme Court has said that Congress has the ability to formulate the fair use doctrine, you know, within the particular context of a particular case. Can you explain why that makes a difference? Just elaborate a little bit on what you're drawing on and why you think that makes a difference. You said that the First Amendment cases that recognize fair use are in the context of regulations of expression. I mean, they would put this together with Lakewood and say, here's regulation of expression. So, Your Honor, I think the right way to draw it out is so the Supreme Court's cases, you know, the two kind of most related cases that talk about this are Eldred and Golan, and both of those are copyright cases in which Congress, for example, in one of the cases I think extended the period in which a copyright would be available. And so in that sort of situation, the Supreme Court explained that that in and of itself might be a regulation of expression and that it would block others from, you know, infringing on the copying of the copyright and that the First Amendment, the fair use protection is a built-in First Amendment protection to the ability to use that. So we're actually talking about there a regulation of expressive activity. And here we're talking about a regulation of conduct and any effects are incidental. You know, there are downstream effects on the use of the work. And I think, you know, my colleague on the other side admitted that the act of circumvention in itself is not an expressive, you know, that in and of itself is not expressive conduct and that's what's being regulated by the Digital Millennium Copyright Act. It's conduct that prohibits speech. Your Honor, I don't think that's the right way to look at it. That's how I look at it and I don't see how with the precedent that says we're looking not just at whether something is conduct or not but whether the nexus is so close to expression. And here the conduct, which is no bypassing, no disabling of these technical protective measures, knocks out any fair use except for the librarian as gatekeeper provision. Your Honor, it doesn't knock out any fair use. It leaves the ability for people, for example, if somebody, as I mentioned before, wanted to, you know, bought an e-book and wanted to comment on the book, they're still able to comment on the book. They can read the book. They can, you know, see its contents. And then they can make commentary or reviews or parody or, you know, any of these things that they want to do, the fair use sort of general things. What plaintiffs want is to go beyond that and to have the ability to use the, you know, the content in a particular format or to change it or look at the underlying source code. And that's just not what they bargained for and it's not a First Amendment problem that they're restricted from doing that from, you know, having enforced the restrictions that the copyright owner put on the product that is being sold to the plaintiffs or to, you know, actually here we're talking about third party is not about the plaintiffs. Do you think AI is a sexist at all or have you thought about that? I know it isn't in here, but. So, Your Honor, I don't want to get out ahead of the Copyright Office and the Librarian of Congress. I believe that there are some discussions of AI in the current exemption rulemaking process. So, I wouldn't want to get out ahead of exactly how these things interact with each other. Would AI allow a movie maker to, if he gets the exemption, to copy a perfect copy of a movie so that someone watching it would not know that it wasn't the actual movie that had been made? I don't know as a factual matter if AI would allow someone to do that. I mean, I think you're pointing up exactly what the problems are that the Digital Millennium Copyright is protecting against is the ability to just create these unencrypted, you know, high quality copies and distribute them around the world. Can you talk about why? So, Fair Work President requires a, I think a close nexus, clear nexus or close nexus between conduct and speech. Do you agree that this has that nexus? Or if not, why not? I don't think that there's that nexus here to the extent that a nexus is required. Again, we're sort of talking about, you know, a restriction on conduct with incidental effects on speech. I mean, I don't think at a minimum the plaintiffs have shown that there's any sort of nexus, especially because there are many situations. For example, just somebody who, you know, rents a movie on Amazon. It's available for 24 hours. Without these protections, that person could use a device or by themselves circumvent those protections and just keep the copy of the movie forever. I don't think in that, you know, in that scenario, which is an extremely common scenario, that there would be any First Amendment implications at all. Even if there might be in some kind of, you know, specific small sliver of instances, there might be a practical burden on someone's ability to engage in certain expressive activity. When I want to read something that's not First Amendment protected? But, Your Honor, again, the Digital Millennium Copyright Act doesn't prevent you from reading the material. It prevents. I'm talking about the time limit. I said when I read it, but when I watch. Normally we would say when you speak or when you read is actually very much First Amendment protected. I assume the same thing when I watch something. But, again, Your Honor, the Digital Millennium Copyright Act isn't preventing you from watching the movie or reading the book. You're able to do those things. You have to do it within the limits of what, you know, you paid for. I can't watch it when, you know, something comes up. So I can't watch it within 24 hours. And so now I have to go pay again. Your Honor, I think that that's just the sort of access restrictions are a familiar thing. I mean, I don't think anyone would think that there's a problem. A familiar thing doesn't mean that it's not a First Amendment thing. Well, Your Honor, I mean, a good example or something that's akin to this would be a movie theater that bans people from filming a movie while they're in the movie theater. I don't think that anyone would think that there's a First Amendment problem with enforcing that restriction. And that's similar to the sort of access control that we have here. Well, I think if I'm filming it so I can then use clips of it to teach my students in fifth grade, there is a First Amendment interest. But, Your Honor, again, it would still be an incidental effect, and I don't think that it would be a First Amendment violation to enforce that restriction. This is something I struggled with here. Well, everything seems so fact-intensive. How do we know that there's more people who want to pirate and just make money than there are people who want to access this stuff for, I would say, legitimate sort of fair use in that sense, people that they've identified. How do we know? You say incidental. You say there's tons and tons of people. How do I know? So, Your Honor, I have two sort of responses to that. The first response is that I think the examples that this court in the first appeal validated as being not a First Amendment problem show the legitimate sweep of the statute. I mean, you can very easily imagine everyday conduct that people engage in, like renting a movie subject to restrictions, borrowing an e-book or an audio book subject to restrictions, watching a DVD or Blu-ray, using a streaming music site. There's all these kind of everyday activities that people are engaged in that would be lawful applications of the Digital Millennium Copyright Act, even, I think, on plain-touch theory. But I would also just point to – So, I guess the DNC is implicated every day by lots of activities. What I don't understand from your explanation – And I guess there's a real risk out there of people destroying the value of a copyright, technologically, because once I grab it, I can either release it all over the Internet or maybe sell it and make money. So, I guess it's the danger to the copyright holder. But what I don't get is, for an overbreadth problem, we're supposed to know whether there's more bad stuff being stopped than good stuff being stopped. And that's what I don't have any sense of, and I'm just not even sure how to know that at this very early stage. This just seems like a weird sort of application of overbreadth doctrine because everything seems to be – it's going to be very fact-intensive. So, how do I know they haven't shown that there's far more good uses that are being stopped than bad ones each day? That those delays are because somebody is learning disabled and can't process the information in a certain way or can't be exposed to too much stimulation and so has to be exposed to things more slowly. Or the e-book to audio book conversion is because somebody can't read. I mean, how do I know? Or they want to access the film, they need to slow it down and have some time to show it to their students and make longer clips out than the license is allowing. How do I know what those facts are? And if I don't know, how is this appropriate to decide at the pleading stage? Sure. I think this exposes one of the flaws in plaintiff's theory here. And again, as you noted, it's their burden to show that this is the sweep of the statute, that there's a substantial number of illegitimate applications in comparison to the lawful applications. And I think the things you just mentioned about, for example, someone who needs an e-reader or is using it sort of in a class, the other side is just assuming that any time there's a fair use, that that means that that is protected by the First Amendment. I think that assumption is incorrect. And so they haven't actually shown any applications in which this statute is unconstitutionally applied. Again, because we're talking about if you look at what is actually restricted and regulated, it's the act of circumvention, which I don't think the other side is disputing, that is non-expressive conduct. And so the only effects that we're talking about here are effects that are downstream effects on someone's ability to engage in certain protected activity. And that's why you said in your brief that they disputed that this was a relevant comparison. No one would say that a law prohibiting skeleton keys that would let you get into every bookstore that's otherwise locked is a First Amendment protected activity or fair use or anything like that because the act of breaking in isn't. Right? Yes, Your Honor. I mean, I think that's another example similar to the example of being able to prohibit movie patrons from filming the movie while they're sitting in the movie theater. Unless there are further questions, we would ask that this court affirm. Thank you. Thank you. Does Mr. Margo have any time? All right, why don't you take two minutes. Thank you, Your Honor. Three quick points. First, certainly we don't contest that you have no First Amendment right to film the movie in the movie theater or to go into the county jail, as in the Hutchins case, or to go to Cuba. The government's not going to let you. What about the break-in to the bookstore? You know, it's the next Harry Potter book is about to be released, and you want to break in and get it. No, of course not, Your Honor. We don't have it. How is this different? You're saying all these people want to break in. It's media in their lawful possession. The DVDs on my shelf are just mine. I don't have a contract with anybody. What you own is – I mean, you've purchased it subject to limitations. I have not purchased my DVDs subject to any limitations. When I download my – when I decide to watch a movie on Netflix, it says you get it for 48 hours if you pay this price. Do I actually now own that movie and I can do anything I want with it, or am I subject to that 48-hour limitation? We're not contending that, Your Honor, but we haven't had discovery. So it's a technology that allowed me to extend that 48-hour period to 72 hours or a week or forever. You're not claiming that kind of decryption technology that would allow me to change the time limits on how long I can view my Netflix movie? I don't have any First Amendment or fair use claim to that. No, I don't think so, Your Honor. We're talking about reading something in your lawful possession and then making fair use copies of it. I would want to mention that the Parade of Horribles – When you download these e-books, they don't come with any terms and conditions that you have to click on? Your Honor, if the government wanted to raise in discovery the idea – I'm just asking you. You're the one who has the complaints with the examples. When people download their e-books, my recollection is they have to click the term and condition agreement. Is that incorrect? Do you plan to say that that doesn't happen, that, in fact, they're told this e-book is yours, you can do with it whatever you like? That's not alleged in the complaint, Your Honor. Certainly, we don't say that contract remedies against somebody who violated the terms and conditions of an e-book site would violate the First Amendment. But I'm not asking that. What I'm asking is, so if you bought it pursuant to those limitations, you would not then actually possess the right to use it in any other way? Even if you have the – I now have this e-book. I purchased this e-book. I have the technology here in my house to be able to turn it into audio. But if I click the terms and conditions, I'm assuming the terms and conditions that I cannot manipulate the format, that would not be one of your examples then. Your Honor, that's a harder case for us. I don't possess. If you don't possess the e-book, you don't possess it. No, no, no. I possess the e-book pursuant to the terms and conditions.  If the idea is that you don't own the e-book. I own my condo. I own my condo. But if I owned a condo pursuant to homeowner association terms and conditions, I own the condo, but I own it with limitations. And I don't understand why this is any different here. Well, obviously what's different here we're saying is that you own the media in question and can lawfully access it but for 1201A. If I own a skeleton key, can I use it to break into bookstores? If you own a skeleton key, you can break into your own home. Yes, of course. That's not what I said. No, of course you can't break into bookstores. Right. So if you own something, there are limitations on all the things that we own and use. The copyright holder here has the right to control reproduction. Full stop. That is what the copyright is. They have the right to control reproduction of their expression. What your clients wish to do is to use technology to break apart the protections that copywriters put in to prevent reproduction of her expression. I don't know how it is any different from breaking into the bookstore to read something. Copyright recognizes a first sale doctrine where if I buy a book from the bookstore and I take it home, I can do with it as I wish.  Can I reproduce it and sell it on the marketplace? No, because that's one of the exclusive rights in 106. Exactly. They said, I've given this to you, but I have the exclusive right. I'm selling this in the marketplace. But of course you cannot reproduce it and sell it for your own purposes. Then that's what all your clients want to do. They want to reproduce some part of this for their own purposes. Maybe it's fair use or not, but they want to reproduce the copyright holder's expression for their own purposes, and that thereby denies the copyright holder control over the reproduction. Your Honor, copyright holders have always had the limited monopoly allowed by copyright subject to people's ability to dispose of their copies as they wish and for people to be able to copyright facts. Not as they wish, subject to certain limitations. Yes, Your Honor, subject to limitations of copying that is not fair use and that copies protectable elements of the work. Why is this saying this is a copyright limitation? This is a limitation Congress has given to the copyright holder to effectuate their actually pre-existing control over their own expression in the modern era. Because it makes no allowance for fair use or the idea, expression, distinction, the accommodations between copyright and the First Amendment. Has Congress changed the scope of fair use? I don't know, Your Honor. That hasn't come up. The codification in the 76 Act is close to the common law version. I'm not saying that Congress has no scope to change any part of fair use. Your opinion said that abridgment of works was fair use. The original copyright only protected until you actually market something. And then Congress, of course, came along later, I think in 1909, and said abridgment is not fair use. That's part of the copyright holder's rights. So Congress can actually narrow fair use. Your Honor, I think that's correct. It's just not applicable here because here Congress has eliminated fair use, which is not permissible under Eldred and Golan. So how do we know that the elimination is here? As long as you always have the right to assert that a particular application is unconstitutional under the First Amendment, how do we know? And it hasn't eliminated it. You have the librarian process. Judge Pillard said you can try and argue it as a defense. It's always a defense. Your Honor, I think that courts would be hesitant to find an act of Congress unconstitutional in a criminal case as far as forward-looking, wanting to express yourself. I wouldn't advise. Courts do it all the time in the speech. A lot of the First Amendment precedent from the Supreme Court involves criminal prosecutions for speech. I don't know what you mean courts wouldn't. If someone raised a First Amendment defense, courts wouldn't adjudicate that in a criminal case. That was Dan's. Your Honor, yes, I agree that First Amendment defense exists. I just don't think it's sufficient to salvage the constitutionality with respect to the over-breath claim. Very briefly, you asked about trafficking. I would say that the first panel does seem to believe that Bunny's device, the NetVCR, falls on the Grokster side of the line, not the Sony side of the line, the kind of thing that can probably facilitate secondary infringement. We don't have a plaintiff here that has an anti-trafficking claim? I mean plaintiff, right? Professor Green, there are no as-applied challenges left in the case. No, is there a plaintiff that has? All right, so there's no as-applied ones. What activity does he want to engage in that involves trafficking that isn't covered by our Green decision? Professor Green? Sorry, Professor Wong. I'm not aware of anything alleged. There's nothing alleged in the complaint beyond the NetVCR. I would caution, however, that the next person who tries to traffic might be developing a specific tool designed for fair use for repair shops to be able to access Toyota motors. Is there an allegation like that in the complaint? There is no allegation of specific fair use oriented trafficking, carefully crafted tools like that. No. Thank you. Thank you.
judges: Henderson, Millett, Pillard